UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| BULL GAMING N.V., | Case No.  24-mc-80207-LJC |
| Applicant, | |
| | **ORDER DENYING § 1782 APPLICATION** |
| | Re: Dkt. No. 1 |

## I.    INTRODUCTION

Applicant Bull Gaming N.V. (Bull Gaming) filed a 28 U.S. Code § 1782 application to obtain discovery from Payward, Inc. d/b/a Kraken (Kraken) for use in a lawsuit Bull Gaming intends to file in Curaçao against James Hopkins (Hopkins).  Kraken did not oppose the request. Hopkins and John Doe (Doe) intervened in the matter and opposed the application.  The Court held a hearing on February 27, 2024, and heard argument from Bull Gaming, Hopkins, Doe, and Kraken.  ECF No. 27.  Having considered the papers submitted by the parties and the oral arguments presented, for the reasons discussed below, Bull Gaming's § 1782 application is DENIED without prejudice.

## II.    BACKGROUND

### A.    Dispute Between Bull Gaming and Hopkins

Bull Gaming, incorporated in Curaçao, operates "an online gambling platform," Rollbit.com (Rollbit), which provides users "casino experiences and sports betting."  ECF No. 1-2 at 4-5.  Bull Gaming alleges that to open an account Rollbit, users must accept Rollbit's Terms and Conditions, which include provisions that users "may not gamble on behalf of anyone else or as part of an undisclosed syndicate[,]" cannot play from prohibited jurisdictions, and must provide sufficient "Know Your Customer" (KYC) information to Rollbit.  *Id.* at 5.  To gamble on Rollbit,

United States District Court
Northern District of California

users must connect their Rollbit account to online cryptocurrency wallets, where they can withdraw funds "for bets and where winnings may be transferred." *Id.* Although ownership of cryptocurrency wallets "is not publicly available, details of transactions to and from wallets ["on-chain information"] can be accessed online." ECF No. 1-5 (First Brown Decl.) ¶ 10.

In February 2023, Bull Gaming contacted Hopkins and offered him a $1,310 bonus for opening an account on the Rollbit platform. ECF No. 15-4 (Hopkins Decl.) ¶ 4. Hopkins, who attests to being a "known poker player" who has "participated in several professional tournaments," agreed, opening an account with Rollbit on February 16, 2023 under the name "Stake Stinks[.]" *Id.* ¶¶ 6, 8. He attests that Rollbit instructed him to "simply….create a Rollbit account with the email address you've received this email on" and did not require him to submit any KYC information beyond his email address. *Id.* ¶¶ 4, 7. Between February 2023 and April 2024, Hopkins "accumulated approximately $70,000,000 of winnings[.]" *Id.* ¶ 19. Rollbit paid him approximately $50,000,000, but, Hopkins attests, "has not yet" paid the remaining $19,644,529.31. *Id.* ¶¶ 16, 20.

Hopkins has least three different cryptocurrency wallets linked to his Rollbit account, which Bull Gaming refers to as Wallet JH-1, Wallet JH-2, and Wallet JH-3. ECF No. 1-5 ¶¶ 8, 11. "Between January and April 2024," Hopkins "transferred $83.7 million in cryptocurrency from Wallet JH-3 to Rollbit[,]" transferred $115 million in cryptocurrency from Rollbit to Wallet JH-1, and transferred $18 million from Rollbit to Wallet JH-2. *Id.* ¶ 9. In March 2024, Hopkins made a series of transfers from JH-1 to a cryptocurrency wallet on Kraken's cryptocurrency exchange with the address 0x983ccBD5473f386441f083644eda273B034fa5B5 (Kraken Bridge 1). *Id.* ¶ 13. Following each transfer from JH-1, the same amount of funds was transferred from Kraken Bridge 1 to a different cryptocurrency wallet with the address 0x89e51fA8CA5D66cd220bAed62ED01e8951aa7c40 (Kraken 7). *Id.* Hopkins does not maintain an account with Kraken. ECF No. 15-4 ¶ 26.

The series of four transfers from JH-1 to Kraken Bridge 1 and Kraken Bridge 1 to Kraken 7 is as follows: On March 22, 2024, Hopkins transferred $100 in cryptocurrency from JH-1 to Kraken Bridge 7. ECF No. 1-5 ¶ 13. Two hours later, $100 was transferred from Kraken Bridge 1

2

to Kraken 7.  On March 25, Hopkins transferred $2.6 million from JH-1 to Kraken Bridge 1.   $2.6 million was then transferred from Kraken Bridge 1 to Kraken 7 about twenty minutes later.  *Id.* On March 26, 2024, Hopkins transferred $2.5 million in cryptocurrency from JH-1 to Kraken Bridge 1; minutes later, $2.5 million was then transferred from Kraken Bridge 1 to Kraken 7.  *Id.* Later in the afternoon on March 26, 2024, Hopkins transferred $2.4 million from JH-1 to Kraken Bridge 1.  *Id.*  $2.4 million was then transferred from Kraken Bridge 1 to Kraken 7 thirteen minutes later. *Id.*

Based on the significant sums Hopkins was wagering and the manner in which he was transferring funds to and from Rollbit, Bull Gaming began to suspect that Hopkins was using his Rollbit account to gamble on behalf of a syndicate or other individuals.  ECF No. 1-2 at 6.  In April 2024, Bull Gaming requested information verifying Hopkins' location and identity, but Hopkins allegedly provided "minimal and insufficient information" and froze Hopkins' account. *Id.*; ECF No. 1-5 ¶ 14.  Hopkins disputes that his information was deficient.  15-4 ¶¶ 17, 25.  Bull Gaming claims it intends to sue Hopkins in Curaçao for tortious acts and unjust enrichment based on his suspected violation of Rollbit's terms and services. ECF No. 1-2 at 4.  Hopkins claims that Bull Gaming still owes him $19,644,529.31 in outstanding winnings.  ECF No. 15-4 ¶¶ 20, 26.

**B.    § 1782 Application**

Kraken, based in San Francisco, is a cryptocurrency exchange where users can buy, sell, and trade cryptocurrency.  ECF No. 1-5 (Brown Decl.) ¶ 6.  As described above, based on publicly available on-chain information, Bull Gaming learned about a series of four transfers from Hopkins' cryptocurrency wallet JH-1 to Kraken Bridge 1 and then from Kraken Bridge 1 to Kraken 7 in March 2024.  *See id.* ¶ 13.  The identities of the owners of the cryptocurrency wallets Kraken Bridge 1 and Kraken 7 are not publicly available.  *See id.* ¶ 10.  Bull Gaming asserts that Kraken knows the identities of the owners of Kraken Bridge 1 and Kraken 7, as prospective accountholders must provide "personal information, including name, date of birth, street address, and identification documents" to Kraken before opening an account.  ECF No. 1-2 at 6; ECF No. 1-5 ¶ 18.

Bull Gaming asserts that learning the identities of Kraken Bridge 1 and Kraken 7 "is

United States District Court
Northern District of California

relevant to the proceedings it intends to bring against" Hopkins in Curaçao, and filed the present §

1782 application in order to obtain such identifying information from Kraken. ECF No. 1-5 ¶ 16.

Specifically, Bull Gaming seeks "All documents and information, including all details regarding

beneficial owner and/or ultimate beneficial owner and/or ultimate beneficiary of funds" relating to

the four March 2024 cryptocurrency transfers from Kraken Bridge 1 to Kraken 7. ECF No. 1-3

(Proposed Subpoena) at 4-5. "Information" is defined as follows:

> [A]ny and all data, records, documents, communications, or materials, regardless of form or format, whether physical or electronic. This includes, but is not limited to:
>
> a. Personal Data: Any data that relates to an identified or identifiable individual, including but not limited to names, addresses, dates of birth, social security numbers, passport numbers, driver's license numbers, and any other unique personal identifiers.
>
> b. Financial Information: Records of financial transactions, bank account details, credit card information, financial statements, tax records, and any other data reflecting financial activities or status.
>
> c. Know Your Customer (KYC) Documentation: All documents and records obtained during the KYC process, including but not limited to identity verification documents (e.g., passports, driver's licenses, utility bills), customer profiles, risk assessments, due diligence reports, and any other information collected to comply with KYC regulations.

*Id.* at 4.

Bull Gaming and Kraken apparently met and conferred regarding the scope of information

sought by Bull Gaming. *See* ECF No. 12. Kraken agreed to provide the following information

about the owner of Kraken Bridge 1:

> (a) The full name and residential address and contact details including email addresses, telephone numbers, fax numbers… (b) Historical account activity and transaction data; (c) Verification information provided to [Kraken] including copies of passports, driving licenses, and Government-issued identity cards; (e) Browser information; (f) Log Information; and (g) banking and cryptocurrency address information

*Id.* at 3.

## C.   Hopkins' and Doe's Motions to Intervene

Hopkins filed a motion to intervene and proposed opposition to the § 1782 application.

United States District Court
Northern District of California

4

ECF No. 15.  His motion to intervene was granted and his opposition was deemed filed.  ECF No. 25.  On December 20, 2024, the owner of the cryptocurrency wallet Kraken Bridge 1, proceeding anonymously as John Doe, filed a motion to intervene.  ECF No. 28.  He asserted that he has a protectable interest at stake in this action, as Bull Gaming sought his "personal financial information" and personal identifying information" linked to his cryptocurrency wallet.  *Id.* at 6.  The parties stipulated to allow John Doe to intervene in this action, ECF No. 31, and Doe proceeded to file his own opposition to Bull Gaming's § 1782 application.  ECF No. 36.

## III.    EVIDENTIARY OBJECTIONS

Bull Gaming's application relies on declarations by Victoria Brown and Thomas Aardenburg and attachments thereto.  *See* ECF Nos. 1-4, 1-5, 17-2, 17-3, 37-1, 37-2.  Doe requests that this evidence be stricken, arguing that Brown and Aardenburg's first two declarations were not made under penalty of perjury, that portions of each Brown declarations and Aardenburg's third declarations are not based on personal knowledge, and that the second and third Brown and Aardenburg declarations are untimely.  ECF Nos. 36 at 26; 38 at 2-4.  The Court recognizes Doe's concerns and is particularly troubled by the minimal evidence establishing Victoria Brown's personal knowledge of the facts she attests to.  *See* ECF Nos. 1-5 (First Brown Decl.); 17-2 (Second Brown Decl.); 37-2 (Third Brown Decl.).  Brown attests that she provides "operational services to Bull Gaming" yet none of her declarations explain what this role entails or the basis for her personal knowledge of Hopkins' wagering on Rollbit, the cryptocurrency transfers at issue, or Hopkins' alleged agreement to and violation of Rollbit's Terms and Conditions.  *See id.*  Although the Court could deny Bull Gaming's application based on these deficiencies, it need not do so as there are independent grounds to deny the application.  As the Court need not rule on Doe's evidentiary objections, it declines to do so here and assumes for the purpose of ruling on this application that Bull Gaming's evidence is competent.

## IV.    ANALYSIS

### A.    Legal Standard

28 U.S. Code § 1782 authorizes district courts to order persons or entities within its district to produce discovery "for use in a proceeding in a foreign or international tribunal" unless doing

so would violate an applicable privilege.  28 U.S.C. § 1782.  "Section 1782's statutory language has been distilled to permit district courts to authorize discovery where three general requirements are satisfied: (1) the person from whom the discovery is sought resides or is found in the district of the district court where the application is made; (2) the discovery is for use in a proceeding in a foreign or international tribunal; and (3) the application is made by a foreign or international tribunal or any interested person."  *Khrapunov v. Prosyankin*, 931 F.3d 922, 925 (9th Cir. 2019) (quotations omitted).

If these threshold requirements are met, courts exercise their discretion in determining whether to grant the application, considering:

> 1. Whether "the person from whom discovery is sought is a participant in the foreign proceeding";
> 2. "[T]he nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance";
> 3. Whether the "request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States";
> 4. Whether the request is "unduly intrusive or burdensome[.]"

*Intel Corp. v. Advanced Micro Devices, Inc.* 542 U.S. 241, 264-65 (2004).  Courts have "broad discretion to determine whether, and to what extent, to honor a request for assistance under 28 U.S.C. § 1782."  *Four Pillars Enterprises Co. v. Avery Dennison Corp.*, 308 F.3d 1075, 1078 (9th Cir. 2002).

### 1.    Statutory Requirements

There is no dispute that Bull Gaming has met the first and third of the threshold statutory requirements of § 1782.  Kraken, the entity from whom the discovery is sought, is located in the Northern District.  *See* ECF No. 1-2 at 8.  Bull Gaming, as the putative plaintiff in the Curaçao action, is an "interested" party under § 1782.  ECF No. 1-2 at 9; *Intel*, 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person [s]' who may invoke § 1782") (quoting 18 U.S.C. § 1782(a)).

Hopkins and Doe argue that Bull Gaming has not met the second statutory requirement. The text of § 1782 authorizes discovery "for use in a proceeding in a foreign or international

United States District Court
Northern District of California

tribunal, including criminal investigations conducted before formal accusation." The Supreme Court in *Intel* clarified that § 1782 does not require the foreign proceeding to be underway, but that it must "be within reasonable contemplation." 542 U.S. at 259. Hopkins and Doe contend that the purported Curaçao action is not "within reasonable contemplation" (ECF No. 36 at 1) and that the information cannot be "for use" in that action because Bull Gaming will not be able to assert a viable claim under Curaçao law (ECF Nos. 15-2 at 12-13; 36 at 16).

> ### a.    Whether the Curaçao Proceeding is "Within Reasonable Contemplation"

*Intel* established that § 1782(a) does not require the foreign proceeding to be "pending or imminent" but "only that a dispositive ruling [in the foreign proceeding] be within reasonable contemplation." 542 U.S. at 259 (quotations omitted). Quoting Smit, *International Litigation* at 1026, the Supreme Court noted, "It is not necessary ... for the [adjudicative] proceeding to be pending at the time the evidence is sought, but only that the evidence is eventually to be used in such a proceeding." *Id.* The Ninth Circuit has not articulated a test for determining when a foreign proceeding is "within reasonable contemplation" and Doe urges the Court to follow the Second Circuit, which held that a § 1782 "applicant must have more than a subjective intent to undertake some legal action, and instead must provide some objective indicium that the action is being contemplated" and that it "will be instituted within a reasonable time." *See Certain Funds, Accts. &/or Inv. Vehicles v. KPMG, L.L.P.,* 798 F.3d 113, 123 (2d Cir. 2015) (citing *Application of Consorcio Ecuatoriano de Telecomunicaciones S.A. v. JAS Forwarding (USA), Inc.*, 747 F.3d 1262, 1270 (11th Cir. 2014)).

Doe asserts that there "is no objective indicium" that Bull Gaming was contemplating litigation when it filed its § 1782 application in August 2024. ECF No. 36 at 14. He argues that, had Bull Gaming actually been planning to file suit in Curaçao, it would have done so already. ECF No. 36 at 14. Bull Gaming counters that there is no requirement that a contemplated foreign proceeding "be filed quickly[.]" ECF No. 37 at 5. Bull Gaming is correct in asserting that there is no requirement that the "contemplated proceeding" be filed within a set time; while other circuits have read *Intel* to require that the proceeding "be instituted within a reasonable time[,]" an

1   approach this Court agrees with, there is no indication that a delay of eight months is

2   unreasonable.  *Certain Funds,* 798 F.3d at 123.  Doe next argues that the contemplated Curaçao

3   litigation is "speculative" as Bull Gaming offers conclusory and shifting descriptions of the claims

4   it intends to file against Hopkins.  ECF No. 36 at 15.  But Bull Gaming's claims against Hopkins

5   have remained largely consistent: it asserts that Hopkins violated its Terms and Conditions by not

6   providing Know Your Customer information and gambling on behalf of a syndicate, and was

7   unlawfully enriched as a result.  ECF Nos. 1-2 at 4; 37 at 2.  This does not support Doe's argument

8   that, when Bull Gaming first filed its § 1782 application, it was not reasonably contemplating

9   filing suit in Curaçao.

10        While the Court finds the Second Circuit's framework of looking at "objective indicium"

11   in determining if the foreign proceeding is actually within reasonable contemplation conceptually

12   useful, "[t]here are not precise contours regarding what constitutes sufficient objective indicia[.]"

13   *In re Application of Stephen Shefsky for an Ord. to Take Discovery for Use in Foreign Proc.*

14   *Under 28 U.S.C. § 1782*, No. 23-cv-00633, 2024 WL 2275215, at *4 (D. Nev. May 20, 2024).

15   However, as the District of Nevada recognized, "a significant through line exists among cases in

16   which petitioners' applications have been denied: typically, these applicants *need* the § 1782

17   discovery to determine whether they have a cognizable claim or to determine whether they will

18   bring suit in the first place."  *Id.*; *see Mangouras v. Squire Patton Boggs,* 980 F.3d 88, 101 (2d

19   Cir. 2020).  That is, if whether the applicant files their foreign proceeding and which claims they

20   bring depends "on what the evidence" sought in a § 1782 application shows, such proceedings are

21   "deemed to be speculative and not within reasonable contemplation."  *In re Application of Stephen*

22   *Shefsky*, 2024 WL 2275215, at *4.  In contrast, a claim may be within reasonable contemplation

23   when the information sought in the § 1782 application will not determine if the foreign proceeding

24   is actually filed, and the applicant knows "who he will sue, where he will sue, when he will sue,

25   and that certain facts in his underlying claims did indeed take place[,]" independent from the

26   information sought in the § 1782 application.  *Id.*  This approach is consistent with the statutory

27   text, which authorizes district courts to order discovery "for use in a proceeding in a foreign or

28   internal tribunal," not for use to determine whether a proceeding with be initiated.  28 U.S. Code §

1782.

Here, Bull Gaming has identified that it intends to sue Hopkins in Curaçao for breaching the Terms and Agreements and seeks to recover the funds it claims it unjustly paid Hopkins. This is "more than just a twinkle in counsel's eye." *Certain Funds,* 798 F.3d at 124; *see* ECF No. 37 at 7-8. While Bull Gaming has not indicated when it will be filing its Curaçao proceeding, there is sufficient indicia to satisfy *Intel*'s permissive standard that the Curaçao lawsuit is "within reasonable contemplation." 542 U.S. at 259. Moreover, whether or not Bull Gaming files suit in Curaçao is not contingent on the § 1782 discovery: as Doe acknowledges, Bull Gaming's claim that Hopkins "was placing bets on behalf of a third party" does not depend on "procuring Doe's [particular] identity[,]" let alone "Doe's banking information." ECF No. 36 at 25. There is no indication that Bull Gaming is "merely seeking discovery to determine whether [it] can bring [its] claim [against Hopkins] in the first place." *In re Application of Stephen Shefsky*, 2024 WL 2275215, at *6.[1]

The Court accordingly finds that the Curaçao proceeding is within sufficient contemplation under *Intel*.

### b.      Whether the Information Will be Used in the Curaçao Action

Doe and Hopkins request the Court finds that Bull Gaming has not satisfied the second statutory element because the information sought in the § 1782 application will not actually be used in the contemplated Curaçao action. *See* ECF Nos. 15-2 at 13-16, 36 at 16-17. 28 U.S. Code § 1782(a) requires that information sought in an application be "for use" in the foreign proceeding. Hopkins and Doe argue that Bull Gaming "cannot state a prima facie case against Hopkins[,]" and thus the information sought in the § 1782 application will not actually be used in the Curaçao action. ECF Nos. 36 at 16; *see* 15-2 at 15-16. This necessarily requires the Court to consider the merits of the Curaçao action. The Court finds it more appropriate to do so in its discussion of the discretionary factors rather than when determining if Bull Gaming has met the statutory elements.

---

[1] To the extent Doe argues that the § 1782 application is an improper "fishing expedition" for Bull Gaming to gather evidence to determine if it may add additional parties to the Curaçao lawsuit, ECF No. 36 at 18, the Court considers this in its discussion of the discretionary factors and not in determining if the Curaçao action is "within reasonable contemplation[.]" *Intel*, 542 U.S. at 259.

United States District Court
Northern District of California

1  *See Zuru, Inc. v. Glassdoor, Inc.*, 614 F. Supp. 3d 697, 703 (N.D. Cal. 2022) (explaining that §

2  1782 does not "require the Court to evaluate the merits" of the foreign claim in determining if the

3  statutory elements have been met, but that courts may consider the merits when considering

4  "'what, if any judicial assistance is appropriate'") (citing *Intel*, 542 U.S. at 266).

5         The Court accordingly finds that the application satisfies the second statutory requirement

6  that the information sought is for use in the contemplated Curaçao proceeding.

               **2.**      **Discretionary Factors**

8         If an applicant has satisfied the three statutory requirements of § 1782(a), courts next

9  exercise their discretion in deciding whether to grant a § 1782 application.  Courts are guided by

10  four factors set forth in *Intel*, although these factors are "neither exclusive nor mandatory."  *In re*

11  *Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944, 2013 WL 183944, at *3 (N.D. Cal. Jan.

12  17, 2013).  "Even if the applicant satisfies the discretionary *Intel* factors, a request should be

13  denied if the court suspects that the request is a fishing expedition or a vehicle for harassment."  *In*

14  *re Komanokai*, No. 20-mc-80149, 2020 WL 6684565, at *3 (N.D. Cal. Nov. 12, 2020) (citations

15  omitted).  District courts have "broad discretion" in choosing whether to allow discovery under §

16  1782.  *Four Pillars*, 308 F.3d at 1078.  The Court addresses the *Intel* discretionary factors first.

               **a.**      **Whether the Information Sought is Obtainable in the Curaçao**
                        **Proceeding**

18         Under the first *Intel* factor, courts consider whether "the person from whom discovery is

20  sought is a participant in the foreign proceeding[.]"  542 U.S. at 264.  "[W]hen the person from

21  whom discovery sought" is a participant, "the need for § 1782(a) aid generally is not as apparent

22  as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad."  *Id.*

    The Supreme Court explained its rationale:

23          A foreign tribunal has jurisdiction over those appearing before it, and
24          can itself order them to produce evidence…In contrast,
        nonparticipants in the foreign proceeding may be outside the foreign
25          tribunal's jurisdictional reach; hence, their evidence, available in the
        United States, may be unobtainable absent § 1782(a) aid.

26  *Id.*  Following this explanation, courts may consider whether the evidence sought in a § 1782

27  application is obtainable in the foreign proceeding, rather than just if the target of the application

*United States District Court*
*Northern District of California*

10

1  is a party to the foreign proceeding.  *See In re Jud. Assistance Pursuant to 28 U.S.C. 1782 by*

2  *Macquarie Bank Ltd.*, No. 14-cv-00797, 2015 WL 3439103, at *6 (D. Nev. May 28, 2015)

3  ("Although the case law at times refers to whether the 'person' is within the foreign tribunal's

4  jurisdictional reach, the key issue is whether the material is obtainable through the foreign

5  proceeding."); *In re Ex Parte LG Elecs. Deutschland GmbH*, No. 12CV1197, 2012 WL 1836283,

6  at *2 (S.D. Cal. May 21, 2012).  Magistrate Judge Paul Grewal explained:

> 7  The issue of whether an entity is a participant, however, is not
> dispositive; *Intel* puts it in the context of whether the foreign tribunal
> 8  has the authority to order an entity to produce the disputed evidence.
> Other courts have interpreted this to focus on whether the evidence is
> 9  available to the foreign tribunal, because in some circumstances,
> evidence may be available to a foreign tribunal even if it is held by a
> 10  non-participant to the tribunal's proceedings.

11  *In re Ex Parte Application of Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1039 (N.D. Cal. 2016)

12  (quotations omitted).

13      Bull Gaming seeks information from Kraken.  *See* ECF No. 1-3 (Proposed Subpoena) at 1.

14  Bull Gaming does not intend to name Kraken as a party to the contemplated Curaçao proceedings,

15  and Hopkins does not argue that this factor weighs against granting the § 1782 application.  ECF

16  Nos. 1-2 at 9; 1-4 ¶¶ 8, 9; ECF No. 15-2 at 16.  Doe acknowledges that Kraken "is not likely to be

17  a party in the Curaçao action" but claims this factor nonetheless weighs against granting the

18  § 1782 application because the information Bull Gaming seeks, namely, Doe's identity, "would be

19  obtainable…in the Curaçao action" from Hopkins.  ECF No. 36 at 20.  Doe argues that "under

20  Curaçao law, Bull [Gaming] could use Curaçao discovery procedures to obtain Doe's identity

21  from Hopkins in the Curaçao proceedings, as well as any relevant details relating to the

22  Hopkins/Doe transactions identified in the Application[.]"  *Id.*

23      The Court agrees with Doe that whether Kraken will be a party in the Curaçao proceeding

24  is not dispositive, and the more useful inquiry is if the information Bull Gaming seeks is available

25  in the Curaçao action.  *See id.*; *Qualcomm*, 162 F. Supp. 3d at 1039.  But Doe's argument that Bull

26  Gaming can obtain the information it seeks from Hopkins in the Curaçao action is unconvincing.

27  Kraken has apparently agreed to provide detailed information about Doe, including his name,

28

United States District Court
Northern District of California

11

United States District Court
Northern District of California

contact information, account activity on Kraken, copies of his passport, driver's license, and government-issued identification cards, browser and log information, and information relating to his banking and cryptocurrency addresses. ECF No. 12 at 3. Doe has presented no evidence suggesting that Hopkins has such detailed information or that Bull Gaming would be able to obtain it from him in the Curaçao proceeding. While Hopkins may know basic identifying information about Doe, as Bull Gaming argues, the detailed records it seeks about Doe "are vastly different from whatever information Hopkins might drum up" or have access to. ECF No. 37 at 8. As there is little indication that the information Bull Gaming seeks is obtainable from Hopkins in the Curaçao action, this factor weighs in favor of granting the § 1782 application.

**b.      The Nature of the Foreign Tribunal**

The second *Intel* factor instructs courts to consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." 542 U.S. 264. "This factor focuses on whether the foreign tribunal is willing to consider the information sought." *In re: Ex Parte Application Varian Med. Sys. Int'l AG*, No. 16-mc-80048, 2016 WL 1161568, at *4 (N.D. Cal. Mar. 24, 2016). Courts may decline to order discovery under § 1782 where "there is reliable evidence that the foreign tribunal would not make any use of the requested material[.]" *Id.* (citations omitted). "In the absence of authoritative proof that a foreign tribunal would reject evidence obtained with the aid of section 1782, courts tend to err on the side of permitting discovery." *Id.* (citations omitted); *see In re Med. Corp. Seishinkai*, 21-mc-80160, 2021 WL 3514072, at *3 (N.D. Cal. Aug. 10, 2021) (finding the second *Intel* factor weighed in favor of granting the § 1782 application where there was an "absence of evidence that Japanese courts would object to Applicant's discovery of the information sought in the subpoena, or that Japanese courts object more generally to the judicial assistance of U.S. federal courts").

Bull Gaming argues that "Curaçao courts are receptive to information obtained with U.S. federal court assistance." ECF Nos. 1-2 at 10; 1-4 ¶ 10. Hopkins does not argue that this factor weighs against granting the § 1782 application, and Doe "does not dispute that courts in Curaçao may generally be receptive to judicial assistance from U.S. federal courts." ECF No. 36 at 21.

But Doe contends that this factor weighs against granting the application because the Court is "hampered from assessing the character of the proceedings underway abroad because they are not, in fact, underway." *Id.* (quotations omitted). While this argument is appropriate in evaluating the statutory elements and in assessing if the § 1782 application has been brought for an improper purpose, it is misplaced here. As Doe and Hopkins have not shown that Curaçao courts "object…generally to the judicial assistance of the U.S. federal courts[,]" the undersigned finds that this factor weighs in favor of granting the application. *In re Med. Corp. Seishinkai*, 2021 WL 3514072, at *3.

### c. Whether the § 1782 Application is an Attempt to Circumvent Foreign Proof-Gathering Restrictions

Considering the third *Intel* factor, courts determine if a § 1782 application "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." 542 U.S. at 265. "Courts have found that this factor weighs in favor of discovery where there is nothing to suggest that the applicant is attempting to circumvent foreign proof-gathering restrictions." *In re Med. Corp. Seishinkai*, 2021 WL 3514072, at *3 (cleaned up).

Doe argues that this factor weighs against granting the application because Bull Gaming ought to "utilize Curaçao party discovery to learn Doe's identity…and to discover information in Hopkins' possession about transactions between Hopkins and Doe." ECF No. 36 at 21. Roping "U.S.-based Kraken into this dispute" and potentially expending more of this Court's time in anticipated litigation over a protective order, he argues, is unnecessary. *Id.* at 22. His argument is unpersuasive. First, he assumes that Bull Gaming will be able to obtain the information it seeks from Hopkins in the contemplated Curaçao action. *See id.* This is questionable as there is no indication that Hopkins has the detailed information Bull Gaming seeks and, as discussed below, it is not clear that Curaçao discovery procedures authorize the procurement of this information. Second, he cites to no authority supporting his contention that U.S. federal courts should consider the burden on themselves when ruling on a § 1782 application. Such burden is irrelevant to whether the application is an "attempt to circumvent foreign proof-gathering restrictions" and would, presumably, always weigh against granting an application where doing so created the risk

13

United States District Court
Northern District of California

1    of further litigation regarding protective orders or compliance with the subpoena.  *Intel*, 542 U.S.

2    at 265.  Third, although "a perception that an applicant has side-stepped less-than-favorable

3    discovery rules by resorting immediately to § 1782 can be a factor in a court's analysis[,]" there is

4    no requirement that applicants first exhaust foreign discovery before turning to § 1782

5    applications.  *In re CRT Antitrust Litig.*, 2013 WL 183944, at *3 (quotations omitted).  Reading

6    such a requirement in to § 1782 would frustrate the statute's aim of "providing efficient assistance

7    to participants in international litigation."  *Intel*, 542 U.S. at 252.

8        Hopkins argues that the § 1782 application is an attempt to circumvent Curaçao proof-

9    gathering restrictions as Bull Gaming's request "would not be permissible discovery under

10   Curaçao law."  ECF Nos. 15-2 at 18; 15-11 (Eichhorn Decl.) ¶¶ 22-26.  His attorney in Curaçao,

11   Jeroen Eichhorn, attests that Article 843a of the Curaçao Civil Code on Procedure authorizes

12   parties to request a court to order the other party or non-party "to present certain documents"

13   before or during a lawsuit.  ECF No. 15-11 ¶ 23.  However, Article 843a imposes strict

14   requirements on what documents courts will order be produced:

15               a) The request can only relate to sufficiently identified/identifiable
                 documents that are in their disposal or in their custody.  Fishing
16               expeditions are not allowed;
                 b) The party [making the request] must have a legitimate interest in
17               obtaining those documents…;
                 c) The information that can be obtained from the documents must
18               related to a legal relationship to which the requesting party is a part.

19   *Id.* (quotations omitted).  The limited discovery permitted under Article 843a "constitutes an

20   exception to the general rule that one is not obligated to provide another with access to documents

21   in their possession."  *Id.* ¶ 24.  Eichhorn attests that Bull Gaming has not satisfied the

22   requirements of Article 843a because it "does not substantiate why it wants to have exactly this

23   third-party information…and what exactly they want to do or want to prove with this information"

24   and that "Bull Gaming…cannot show it has a legitimate interest in obtaining the requested

25   documents from Kraken" because it does not "have a viable claim under Curaçao law based on

26   breach of contract or unlawful act (tort) against Hopkins[.]"  *Id.* ¶¶ 25-26; *see* ECF No. 15-2 at 17-

27   19.

28        Hopkins assumes that the correct inquiry under the third *Intel* factor is if Bull Gaming

14

would be able to obtain the information it seeks from Kraken through Curaçao discovery procedures. *See* ECF No. 15-2 at 18. But *Intel* expressly declined to add a "foreign-discoverability rule" to § 1782. 542 U.S. at 261. "Beyond shielding material safeguarded by an applicable privilege…nothing in the text of § 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there." *Id.* at 260. The Second Circuit explained:

> Few if any foreign jurisdictions permit the scope of discovery available in our courts. Consequently, if district courts were free to refuse discovery based upon its unavailability in a foreign court … § 1782 would be irrelevant to much international litigation, frustrating its underlying purposes.

*Mees v. Buiter*, 793 F.3d 291, 302 (2d Cir. 2015) (citations and brackets omitted). Following *Intel*, courts must determine if a § 1782 application is an attempt to evade a foreign jurisdiction's prohibition against gathering or obtaining the information sought, not if the foreign jurisdiction's discovery procedures facilitate gathering such information. *See* 542 U.S. at 260-62 ("A foreign tribunal's reluctance to order production of materials present in the United States similarly may signal no resistance to the receipt of evidence gathered pursuant to § 1782(a)."). Squaring *Intel*'s rejection of a foreign-discoverability rule with its instruction that courts assess if a § 1782 application is an attempt to "circumvent foreign proof-gathering restrictions[,]" the Second Circuit held:

> That a country does not enable broad discovery within a litigation does not mean that it has a policy that restricts parties from obtaining evidence through other lawful means. Proof-gathering restrictions are best understood as rules akin to privileges that *prohibit* the acquisition or use of certain materials, rather than as rules that *fail to facilitate* investigation of claims by empowering parties to require their adversarial and non-party witnesses to provide information.

*Mees*, 793 F.3d at 303 n.20 (cleaned up).

Hopkins does not argue that there exists "any privilege-like rule, privacy protection, or similar *prohibition*" under Curaçao law forbidding Bull Gaming from acquiring or using the information it seeks in its § 1782 application in the contemplated Curaçao proceeding, and neither Doe nor Hopkins argued so at the hearing. *In re Application of Credit Suisse Virtuoso SICAV-SIF in Respect of the Sub-Fund Credit Suisse (Lux) Supply Chain Fin. Fund*, No. 21-mc-80308, 2022

WL 1786050, at *11 (N.D. Cal. June 1, 2022).  Without evidence that the Curaçao court would reject "the receipt of evidence gathered pursuant to § 1782(a)[,]" the fact that Bull Gaming may not be able to obtain such evidence pursuant to Curaçao discovery procedures does not weigh against granting the § 1782 application.  *Intel*, 542 at 262.

### d.    Whether the § 1782 Application is Unduly Intrusive or Burdensome

Lastly, the fourth *Intel* factor directs courts to assess if a § 1782 application is "unduly intrusive or burdensome[.]"  542 U.S. at 265.  Requests that are "unduly intrusive or burdensome … may be rejected or trimmed."  *Id.*  The proper scope of discovery arising out of a § 1782 application is generally determined by the Federal Rules of Civil Procedure.  *In re: Application of Joint Stock Co. Raiffeinsenbank*, No. 16-mc-80203, 2016 WL 6474224, at *6 (N.D. Cal. Nov. 2, 2016).  Following the Federal Rule of Civil Procedure 26, "Requests are unduly intrusive and burdensome where they are not narrowly tailored, request confidential information and appear to be a broad fishing expedition for irrelevant information."  *Qualcomm*, 162 F. Supp. 3d at 1043 (citations omitted).  Requests must seek information that "is relevant to any party's claim or defense and proportionate to the needs of the case[.]"  Fed. R. Civ. P. 26(b)(1).

Bull Gaming argues that its subpoena seeks "limited information" and "is narrowly tailored" to obtain "identifying information associated with four specific transactions."  ECF No. 1-2 at 10; *see* ECF No. 37 at 9.  Hopkins counters that the subpoena is "an unwarranted and incredibly invasive intrusion into [his] private financial life[.]"  ECF No. 15-2 at 20.  John Doe similarly argues that the subpoena seeks an "eye-popping amount of personally identifying and confidential financial information[.]"  ECF No. 36 at 23.  Bull Gaming seeks "[a]ll documents and information" regarding four cryptocurrency transactions, where information is defined as:

> [A]ny and all data, records, documents, communications, or materials, regardless of form or format, whether physical or electronic. This includes, but is not limited to:
>
>> a. Personal Data: Any data that relates to an identified or identifiable individual, including but not limited to names, addresses, dates of birth, social security numbers, passport numbers, driver's license numbers, and any other unique personal identifiers.
>> b. Financial Information: Records of financial transactions,

> bank account details, credit card information, financial statements, tax records, and any other data reflecting financial activities or status.
> c. Know Your Customer (KYC) Documentation: All documents and records obtained during the KYC process, including but not limited to identity verification documents (e.g., passports, driver's licenses, utility bills), customer profiles, risk assessments, due diligence reports, and any other information collected to comply with KYC regulations.

ECF No. 1-3 at 4. Kraken has agreed to provide the following information about the owner of Kraken Bridge 1:

> (a) The full name and residential address and contact details including email addresses, telephone numbers, fax numbers… (b) Historical account activity and transaction data; (c) Verification information provided to [Kraken] including copies of passports, driving licenses, and Government-issued identity cards; (e) Browser information; (f) Log Information; and (g) banking and cryptocurrency address information

ECF No. 1 at 3. Doe claims that this level of intrusiveness is particularly unwarranted where Bull Gaming seeks information regarding Doe, a "***third-party*** foreign individual who holds no relationship whatsoever with Bull [Gaming]." ECF No. 36 at 23.

While the request is apparently not overly burdensome to Kraken—they have agreed to provide much of the requested information—the Court is concerned that the significant amount of personal and financial information Bull Gaming seeks about Doe is disproportionate to the limited and somewhat speculative relevance this information has in its contemplated lawsuit against Hopkins. *See In re Matsumoto,* No. 23-mc-80230, 2023 WL 6959279, at *3 (N.D. Cal. Oct. 19, 2023) (finding a portion of a request "unduly intrusive" where it sought "personal information entirely unrelated" to the action). Bull Gaming professes a need to obtain "information sufficient to identify the beneficial owner" of the four transactions. ECF No. 37 at 9. Doe argues:

> Bull wants to know who John Doe *is*, but it has failed to articulate how procuring Doe's identity will affect Bull's threatened claims ***against Hopkins*** in Curaçao, let alone how, for example, Doe's banking information could be relevant to that case. To the extent Bull seeks to determine whether Hopkins was placing bets on behalf of a third party, Doe's particular identity does not advance that inquiry.

ECF No. 36 at 25. The Court disagrees that "Doe's particular identity" is irrelevant to Bull Gaming's contemplated Curaçao action against Hopkins—Doe being identified as a known member of a gambling syndicate, for example, would plausibly bolster Bull Gaming's claim—but

agrees that the scope of information Bull Gaming seeks is disproportionate at this stage. *Id.* Doe's transaction history, passport and driver's license, banking and log information and contact information are far more than "sufficient to identify" him. ECF No. 37 at 9. Moreover, information sought about Doe from Kraken is irrelevant to Bull Gaming's claims against Hopkins is based on Hopkins' purported failure to provide sufficient Know Your Customer information. While the Court could narrow the application to limit the information Bull Gaming could obtain from Kraken, given its concerns about the legitimacy of the Curaçao proceedings, discussed below, it declines to do so and instead denies the application without prejudice.

### e.    Additional Factors

District courts have "broad discretion" in deciding whether to grant, modify, or deny a § 1782 application. *Four Pillars*, 308 F.3d at 1080. The four *Intel* factors are "neither exclusive nor mandatory" and courts may consider a "wide range of potentially applicable factors" including whether the "court suspects that the request is a fishing expedition or a vehicle for harassment[.]" *In re CRT Antitrust Litigation*, 2013 WL 183944, at *3; *In re Premises Located at 840 140th Ave. NE, Bellevue, Wash.*, 634 F.3d 557, 563 (9th Cir. 2011) (quotations omitted, citing *In re Request for Assistance from Ministry of Legal Affairs of Trinidad & Tobago*, 848 F.2d 1151, 1156 (11th Cir. 1988)).

The Court is concerned that the § 1782 application may be used for an improper purpose. As Hopkins attests, Bull Gaming paid Hopkins $50,000,000 in winnings with "no issues" before it froze his account and refused to pay him the remaining $19,644,529.31, asserting that Hopkins had not provided required Know Your Customer information. ECF No. 15-4 ¶¶ 17, 20, 21. But Hopkins argues that Bull Gaming had not required him to provide any identifying information beyond his email address when he opened his account, and cannot, under Curaçao law, raise his purported failure to provide such information as a reason for withholding funds. ECF Nos. 15-4 ¶ 7; 21 at 15-16; 21-1 ¶ 10. When Hopkins sought to unfreeze his account and obtain his balance, Bull Gaming asserted he had violated its Terms and Conditions and threatened to sue him. ECF Nos. 15-2 ¶ 17; ECF No. 37-2 ¶ 9. (Hopkins, in turn, has apparently threatened to sue Bull Gaming for refusing to pay him the outstanding $19,644,529.31. *See* ECF No. 37-2 ¶ 7.) Hopkins

asserts that Bull Gaming's threat to sue him is, essentially, a bluff to discourage him from trying to recover the outstanding balance and the § 1782 application is another tactic to harass him.  *See* ECF Nos. 15-2 at 8.

Doe and Hopkins argue that the weakness of the contemplated Curaçao action reveals that it is a vehicle for harassment rather than a legitimate claim Bull Gaming intends to file.  *See* ECF Nos. 15-2 at 8; 36 at 24-25.  Doe asserts that Bull Gaming will be unable to "state a prima facie case" against James Hopkins based on "breach of contract, tortious acts (under Article 6:162 of the Curaçao Civil Code), unjust enrichment (under Article 6:212 of the Curaçao Civil Code) and undue payment (under Article 6:203 of the Curaçao Civil Code)."  ECF No. 36-3 (Krips Decl.) ¶ 22.  These claims all hinge on the existence of an enforceable contract between Hopkins and Bull Gaming.  *See* ECF No. 37-1 (Third Aardenburg Decl.) ¶ 4.  Bull Gaming asserts that there is such a contract: it claims that Hopkins accepted Bull Gaming's Terms and Conditions when he first opened his account with Rollbit in February 2023 and that his ongoing use of Rollbit's services "is sufficient to establish a contract regardless" of his initial acceptance.  ECF Nos. 37 at 7-11; 37-1 ¶¶ 4, 6-7; *see* ECF No. 1-2 at 5.  Doe counters that Bull Gaming has not shown that Hopkins knowingly assented to any terms and conditions when he joined Rollbit in February 2023; that "mere access and usage of a website cannot…manifest assent" to a contract; and that, even if Hopkins agreed to Bull Gaming's Terms and Conditions when he joined in February 2023, he would not be bound to a contract updated in August 2023 absent adequate notice.  ECF Nos. 36 at 16-17; 36-3 ¶ 22.

While it may be wise to avoid "speculative forays into" determining foreign law, courts in this district regularly take "[a] peek at the merits" of the foreign proceeding to ensure the applicant has "legitimate reasons for" obtaining the information it seeks in its § 1782 application.  *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099 (2d Cir. 1995) (warning against district courts turning § 1782 applications into a "battle-by-affidavit of international legal experts); *Zuru* , 614 F. Supp. 3d at 703; *see Takagi v. Twitter, Inc.*, No. 22-mc-80240, 2023 WL 1442893, at *5 (N.D. Cal. Feb. 1, 2023); *In re Komanokai*, 2020 WL 6684565, at *3.

The Court finds it appropriate to "peek at the merits" of Bull Gaming's contemplated

Curaçao action. *Zuru*, 614 F. Supp. 3d at 703. As Bull Gaming states, the claims it intends to bring are all predicated on the existence of an enforceable contract—the Terms and Conditions—between it and Hopkins. ECF No. 37-1 ¶ 4. Bull Gaming's Curaçao attorney, Thomas Aardenburg, attests that Hopkins breached this contract, which constitutes a tortious act under Article 6:162 of the Curaçao Civil Code and led to Hopkins being "unlawfully enriched" under Article 6:203 of the Curaçao Civil Code. *Id.* "To state a prima facie case for breach of contract under Curaçao law, a plaintiff must establish the existence of a contract that was breached by the defendant." ECF No. 36-3 at 8. Despite having ample opportunities to demonstrate that Hopkins entered into a contract with Bull Gaming, Bull Gaming has not credibly done so. While Victoria Brown attests that new users are required to check a box confirming that they read and accepted Bull Gaming's Terms and Conditions, her declaration and the attached exhibit show that this procedure was in place in September 2024, before Hopkins first opened his account. ECF No. 37-2 ¶ 6. This evidence is of limited probative value in showing that a similar procedure existing in February 2023 when Hopkins first opened his account. Similarly, Bull Gaming provided a copy of its Terms and Conditions from August 2023 but does not contend that similar Terms and Conditions were in place when Hopkins opened his account in February 2023 or that he received notice of any updated Terms and Conditions. ECF No. 1-5 ¶¶ 15-16; *see* ECF No. 15-2 at 7-8. While there is certainly no requirement that Bull Gaming prove up its claim in order to obtain information through its § 1782 application, the Court is concerned that Bull Gaming's unwillingness or inability to show the existence of an enforceable contract—despite being aware of this deficiency and claiming it has the evidence remedy it—is indicative that no such contract exists and the contemplated Curaçao action is pretextual. ECF No. 37 at 7-8; *see Takagi*, 2023 WL 1442893, at *6 ("While nothing prevents the Court from considering whether a section 1782 application describes a plausible claim for relief…or otherwise reflects 'good cause' for discovery, the Court is reluctant to endorse a standard for exercising discretion that does not derive from the statute itself[.]").

   The Court is also concerned that, despite Bull Gaming's repeated assurances that the Curaçao action would be filed imminently, nothing has yet been filed. While Bull Gaming argues

1  that "one reason" why the action has not yet been filed is because "Hopkins and Bull Gaming have

2  been engaging in extensive pre-litigation exchanges[,]" this is not supported by its own evidence.

3  ECF No. 37 at 5.  Exhibit B to Victoria Brown's third declaration shows exchanges between

4  Hopkins' and Bull Gaming's counsel regarding the disputed $19,664,259.  ECF No. 37-4.  The

5  last exchange is from October 2024.  *Id.* at 37.  It is unclear why such exchanges prevented Bull

6  Gaming from filing their action in the five months since.

7     Lastly, Bull Gaming may improperly be using the § 1782 application as a "fishing

8  expedition" to gather information to determine whether it will bring claims against individuals

9  other than Hopkins.   ECF No. 36 at 18.  As Bull Gaming acknowledges, it "intends to bring

10  claims against unknown individuals or businesses regarding activities that violated Rollbit's

11  Terms and Conditions and the law" and the "information Kraken holds" may be relevant to these

12  other "potential actions against unknown individuals[.]"  ECF Nos. 17-3 ¶ 4; 18 at 12-13.  But the

13  purpose of § 1782 is to provide litigants with a vehicle to gather discovery for foreign lawsuits that

14  are "within reasonable contemplation[,]" not ones that are "merely speculative."  *Intel*, 542 U.S. at

15  259; *Mangouras,* 980 F.3d 88.  Bull Gaming's claims against "unknown individuals or

16  businesses" for unspecified violations of the Terms and Conditions are highly speculative.  ECF

17  No. 17-3 ¶ 4.  That Bull Gaming admits that the § 1782 application has a dual purpose—to obtain

18  discovery for use in the action against Hopkins *and* to obtain information for unspecified

19  "potential actions"—suggests that its application may be brought for improper reasons.  ECF No.

20  18 at 13; *see In re Premises Located at 840 140th Ave.*, 634 F.3d at 563 ("the district court should

21  deny the request if the district court suspects that the request is a fishing expedition").

22      Given these concerns, as well as the limited relevance of information about Doe, the Court

23  denies Bull Gaming's § 1782 application without prejudice to Bull Gaming refiling a new

24  application once it has filed the Curaçao action.

25     The Court recognizes that its concerns may be misplaced and Bull Gaming may bring a

26  valid claim against Hopkins.  If Bull Gaming does so, and determines it needs information from

27  Kraken for use in that action, it may renew its request.  While having to renew its request

28  obviously would place some administrative and financial burden on Bull Gaming, this does not

outweigh the risk that the application currently before the Court has been brought for an improper purpose.  Moreover, Bull Gaming has not argued that it would face any additional prejudice if it renewed its application at a later date.  There is no indication that the information Bull Gaming seeks from Kraken "would be lost in the interim," that Bull Gaming requires the information sought in its application before it files suit in Curaçao, or that "some substantive stage of the [Curaçao] case [is] likely to arise before the documents could be obtained from" Kraken.  *In re Application of Credit Suisse*, 2022 WL 1786050, at *12.

**V.    CONCLUSION**

For the foregoing reasons, the Court DENIES Bull Gaming's § 1782 application without prejudice.  As this terminates the dispute presently before the Court, the case shall be closed. However, if Bull Gaming renews its application, it shall file its renewed application in this case and serve its renewed application on Kraken, Hopkins, and Doe.

**IT IS SO ORDERED.**

Dated: March 11, 2025

_____
LISA J. CISNEROS
United States Magistrate Judge

United States District Court
Northern District of California